# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JAJUAN D. WILSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 10-CV-610-PJC |
| ) | |
| MICHAEL J. ASTRUE, Commissioner of the ) | |
| Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Claimant, Jajuan D. Wilson ("Wilson"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. terminating the supplemental security income benefits that Wilson received as a child when he reached the age of 18. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Wilson appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Wilson was not disabled. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

## Claimant's Background

Wilson was 19 years old at the time of the hearing before the ALJ on August 4, 2009. (R. 297-302). He testified that he left Memorial High School when he was about 17 years old and in the ninth grade. (R. 302-03). He had been suspended from school, and he thought the suspension had been for fighting. *Id.* Wilson testified that he had been in many fights in school due to people "picking on" him or due to his anger problems. (R. 303). He had repeated grades in seventh grade and in ninth grade due to absences and suspensions. (R. 304-05).

Wilson testified that he had sought employment and had filled out applications with the help of a sister or a girlfriend. (R. 305). He had an interview with Wendy's, but he did not have his food handler's permit. *Id.*

Wilson had no vision with his left eye since the age of 12. (R. 310). The vision in his right eye was good, except that he saw flashes that he compared to being hit in the eye. (R. 314). He had been told that he could lose the vision in his right eye for the same reasons as his left eye, but he tried not to think about that. *Id.* Wilson believed that he had one surgery on his eyes, and that he was supposed to have a second surgery in Oklahoma City, but he had been unable to obtain transportation. (R. 306). He testified that he could see well enough to see words in books, although he might have trouble pronouncing words. (R. 307). He had previously had glasses, but they had been broken in approximately 2007 when he was playing basketball. (R. 308). He had never gotten a new pair. *Id.* He had to look at a computer monitor from a close distance in order to read print, and he had to sit close to a television to see it and to hear it. (R. 308-09). He had headaches about once a day, and he testified that the doctors had told him it might be related to struggling to see things. (R. 312-13).

Wilson testified that he had some hearing in both ears, but his hearing in his left ear was worse than his right. (R. 309). Sometimes he had ringing in his ears, especially his right ear. (R. 310-11). He could do some lip reading, and therefore he could understand people better if they were in front of him instead of behind him. (R. 310). He sometimes had hearing aids, but the last time he attempted to get new ones, he couldn't afford them. (R. 311-12). The hearing aids had helped him. (R. 316).

Wilson testified that his daily activities might include lifting weights, watching television, and doing chores such as sweeping or taking out the trash. (R. 313). He might also go over to someone's house or try to find a computer to use. *Id.*

Wilson testified that he was sad about four or five days a week. *Id.* When he was sad, he would sit by himself quietly for a couple of hours, or he would "catch an attitude with somebody if they bother me." (R. 313-14). When that happened, he would walk off or say something "wrong" to them. (R. 314).

The administrative transcript includes school records from Tulsa Public Schools from 1995 to 2007. (R. 96-165, 294-96). The records in general reflect that Wilson was in special education classes and that he was suspended frequently. (R. 96-165). Among the records is a psychological services comprehensive assessment conducted on January 21, 2004, when Wilson was 13. (R. 294-96). The school psychologist administered parts of the Wechsler Intelligence Scale for Children-IV ("WISC-IV") and the Wechsler Individual Achievement Text-II ("WIAT-II"). *Id.* She explained that she did not administer verbal subtests due to Wilson's hearing problems. (R. 294). On perceptual reasoning, Wilson scored in the 34th percentile, which was in the average range, but his processing speed was in the 5th percentile, which was borderline. *Id.* Wilson's reading, spelling, and numerical operations scores were in the 8th, 19th, and 4th

percentiles respectively, which were considered to be on the fourth or fifth grade level. *Id.*

Records from Stanley R. Lang, Ph.D., of Audiology of Tulsa, Inc. show that he had evaluated Wilson and fit him for hearing aids beginning in 1996. (R. 167-71). On April 22, 2004, Dr. Lang described Wilson as having "moderately severe sensorineural hearing loss" in both ears. (R. 167). Dr. Lang considered hearing aids to be necessary due to the severity of Wilson's hearing loss. *Id.* This diagnosis and recommendation were confirmed by S.J. Worrall, D.O., of Ear, Nose & Throat Clinic of Tulsa on November 13, 2007. (R. 177-79).

Records show that Wilson was seen for an eye examination at Pediatric Eye Associates on December 21, 2007, but the examining physician complained that Wilson was not cooperative and that the historical information about his left eye was not clear. (R. 189-91). The examining physician confirmed that Wilson had no vision in his left eye. *Id.* For Wilson's right eye, the examining physician diagnosed status post laser treatment and assessed Wilson's best correctable distance vision as 20/70 and best near vision as 20/40. (R. 189).

Wilson was seen for another eye examination by Jennifer K. Jones, O.D. on August 13, 2009. (R. 290-93). It appears that Dr. Jones referred Wilson to a cataract surgeon for an evaluation. *Id.*

A Physical Residual Functional Capacity Assessment was completed by an agency nonexamining consultant on July 8, 2008. (R. 259-67). The consultant found that no exertional limitations were established. (R. 260). For visual limitations, the consultant found that Wilson could not see detail at a distance and could not read fine print, but was able to avoid common hazards. (R. 262). Regarding communicative limitations, the consultant found that, without hearing aids, Wilson's hearing loss was less than the Listing level. (R. 263). The consultant stated that Wilson would have difficulty hearing with background noise, but was able to

4

communicate with coworkers and to communicate by telephone. *Id.* For environmental limitations, the consultant said that Wilson needed to avoid concentrated exposure to noise, stating that he needed to avoid unprotected loud noise. *Id.* The consultant also stated that Wilson needed to avoid all exposure to hazards, explaining that the blindness in Wilson's left eye meant that he needed to avoid dangerous moving machinery. *Id.*

On October 13, 2004, Wilson was in the custody of the Department of Human Services and was referred to Larry Vaught, Ph.D. for a psychological evaluation. (R. 172-75). Wilson's composite IQ score was 73, which was in the 5th percentile. (R. 173). His reading, spelling, and arithmetic skills were at a third, fourth, and second grade levels respectively. *Id.* On Axis I[1], Dr. Vaught diagnosed dysthymic[2] disorder and anxiety disorder, not otherwise specified. (R. 174). On Axis II, he diagnosed learning disorder, not otherwise specified, and he gave a provisional diagnosis of borderline intellectual functioning. *Id.*

Agency consultant Dr. John T. Atwood completed Wechsler Adult Intelligence Scale - Third Edition (WAIS-III) testing and an interpretive report on December 27, 2007. (R. 192-94). Dr. Atwood noted that Wilson's hearing and vision problems may have affected his performance on the test. (R. 192-93). Dr. Atwood concluded that Wilson's overall cognitive ability was in the borderline range, with both his verbal and performance scores in the borderline range. (R. 193-94). On a verbal comprehension index, his score was in the borderline range, and his scores on a perceptual organization index and a working memory index were in the low average range.

---

[1]The multiaxial system "facilitates comprehensive and systematic evaluation." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000).

[2]Dysthymia is a "chronic, mild form of depression." Taber's Cyclopedic Medical Dictionary 594 (17th ed. 1993).

(R. 194). Dr. Atwood found that some of Wilson's scores indicated an attention deficit condition, if visual impairment could be ruled out. *Id.* Dr. Atwood found on Axis I that Wilson had symptoms of dysthymic disorder and learning disorder, not otherwise specified. Dr. Atwood included a note to rule out attention-deficit hyperactivity disorder. *Id.* On Axis II, he found symptoms of mild mental retardation. *Id.*

Nonexamining consultant R. F. Smallwood, Ph.D. completed a Psychiatric Review Technique form and Mental Residual Functional Capacity Assessment[3] dated July 8, 2008. (R. 268-85). For Listing 12.02, Dr. Smallwood noted Wilson's diagnosis of learning disabilities, and for Listing 12.04, he noted Wilson's dysthymic disorder. (R. 269, 271). For Listing 12.05, Dr. Smallwood noted Wilson's borderline intellectual functioning. (R. 272). For the "Paragraph B Criteria,"[4] Dr. Smallwood found that Wilson had a moderate degree of limitation in all three areas of activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (R. 278). In the "Consultant's Notes" portion of the form, Dr. Smallwood gave a very brief summary of Dr. Atwood's testing and diagnoses. (R. 280).

On the Mental Residual Functional Capacity Assessment, Dr. Smallwood found Wilson to be markedly limited in his ability to understand, remember, and carry out detailed instructions.

---

[3]The administrative transcript contains several previous assessments similar to Dr. Smallwood's, and several of these are labeled as "advisory." (R. 195-258). Wilson's appeal does not focus on any of these previous assessments, and the Court is not including a summary of them because they do not appear relevant to the issues posed by this case.

[4]There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

(R. 283). He also found Wilson to be moderately limited in his ability to interact appropriately with the general public. (R. 283). Dr. Smallwood stated that Wilson was able to perform one or two step tasks, but could not do more complex ones due to poor concentration and a low performance IQ. (R. 284). He found that Wilson could relate to others on a superficial basis and had the ability to adapt. *Id.*

## Procedural History

Wilson was found to be disabled when he was a young child due to his deafness, and he received supplemental security income benefits. (R. 27). He was found to be not disabled as of his 18th birthday, June 1, 2008, by a disability hearing officer. (R. 45-51). A hearing before ALJ Deborah L. Rose was held August 4, 2009 in Tulsa, Oklahoma. (R. 297-333). By decision dated November 25, 2009, the ALJ found that Wilson was not disabled. (R. 12-21). On August 4, 2010, the Appeals Council denied review of the ALJ's findings. (R. 3-5). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. § 416.1481.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §

404.1520.[5] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

---

[5]Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

## Decision of the Administrative Law Judge

The ALJ found that Wilson had been eligible for supplemental security income benefits until age 18. (R. 14). At Step Two, the ALJ found that Wilson had severe impairments of hearing impairment, vision impairment, and borderline intellectual functioning. *Id.* At Step Three, the ALJ found that Wilson's impairments did not meet any Listing. *Id.*

In her RFC determination, the ALJ found that Wilson had the RFC to perform the work at all exertional levels, with nonexertional limitations of:

> no loud noise environment, inability to read fine print, and inability to see details with distance vision. The claimant is limited to simple routine work. He can relate to coworkers on a superficial basis for work purposes. He can adapt to a work environment. He is capable of communicating on the telephone but not with the public.

(R. 16). At Step Four, Wilson had no past relevant work. (R. 20). At Step Five, the ALJ found there were a significant number of jobs in the national economy that Wilson could perform considering his age, education, work experience, and RFC. *Id.* Therefore, the ALJ found that Wilson's disability ended on his 18th birthday, and Wilson had not become disabled again since that date. (R. 21).

## Review

Wilson raises two issues on appeal. First, Wilson argues that the Step Five determination was erroneous because the Commissioner did not carry his burden of proof that there were significant numbers of jobs in the economy that Wilson could perform. Second, Wilson argues that the ALJ made errors in her analysis of the medical opinion evidence. The Court finds that the ALJ's decision is supported by substantial evidence and is legally sufficient, and the decision is affirmed.

Step Five Finding

At Step Five, the burden shifts to the Commissioner to show that there are jobs in significant numbers that the claimant can perform taking into account his age, education, work experience and RFC. *Haddock v. Apfel*, 196 F.3d 1084, 1088-89 (10th Cir. 1999). The ALJ is allowed to do this through the testimony of a vocational expert ("VE"). *Id.* at 1089. In *Haddock*, the Tenth Circuit ruled that an ALJ must elicit testimony from a VE regarding whether the VE's testimony conflicts with the Dictionary of Occupational Titles (the "DOT"). *Id.* at 1089-92. If there is a conflict, the ALJ must investigate it and elicit a reasonable explanation for the conflict before she can rely on the testimony of the VE. *Id.* at 1091-92.

Wilson's first argument is that some of the jobs identified by the VE should be excluded from consideration due to a conflict between the noise requirements of the RFC determination and the DOT descriptions of these jobs. The VE and the ALJ had an extended inquiry regarding 6 jobs that the VE described as "examples" at the unskilled medium and light ranges:

cleaner, DOT #381-687-018

kitchen helper, DOT #381.687-018

hand packager, DOT #920.587-018 (medium exertion) and #753.587-038 (light exertion)

sorter, DOT #753.587-010

assembler, DOT #701.687-010

(R. 325-27). Regarding the issue of avoiding loud noise, the VE testified that he would reduce the numbers of the last job, assembler, by 50%, but he did not testify to any reductions of any other jobs due to the need to avoid loud noise. (R. 324-25). Wilson complains that the jobs of assembler, kitchen helper, and hand packager at the medium exertional level should have been excluded because the DOT describes them as having a noise level four environment, which is

10

loud.

There are two obvious problems with Wilson's argument. The first is that the VE had already accommodated the conflict with the DOT regarding the assembler job, saying that he would reduce the numbers of that job by 50%. This is a reasonable explanation that resolved the conflict between the DOT and his testimony, and therefore the VE's testimony regarding the assembler job was substantial evidence that supported the ALJ's Step Five finding. *See, e.g., Rogers v. Astrue*, 312 Fed. Appx. 138, 141-42 (10th Cir. 2009) (unpublished) (VE's testimony that in his experience job listed as light was performed at sedentary level resolved conflict with DOT).

The second obvious problem with Wilson's argument is that, if the Court were to consider the asserted conflict between the kitchen helper and hand packager and the DOT as excluding those 2 jobs, there would still be 4 jobs identified by the VE remaining. *See, e.g., Barrett v. Astrue*, 340 Fed. Appx. 481, 487-89 (10th Cir. 2009) (unpublished) (even if court accepted claimant's argument, there was still a remaining job identified by the VE, and therefore there was no basis for finding error in the ALJ's Step Five conclusion); *Rogers*, 312 Fed. Appx. at 141-42 (while it was a close question because 3 light jobs identified by the VE should have been excluded, VE's testimony as to 1 sedentary job was sufficient to support the ALJ's Step Five determination). Thus, even if the undersigned accepts Wilson's argument as persuasive, the VE's testimony regarding the remaining 4 jobs would be sufficient to support the ALJ's decision here.

Wilson's second argument related to the Step Five finding of the ALJ is that 3 jobs, the hand packer job performed at the light exertional level, the cleaner job, and the sorter job, are performed at noise level 3, which is defined as moderate. Plaintiff's Opening Brief, Dkt. #15, p.

4. Wilson states that he is unable to perform these jobs, but he disregards the fact that the ALJ's RFC determination included a requirement of "no loud noise environment" rather than a requirement of excluding even a moderate noise environment. (R. 16). Wilson's confusion apparently stems from the fact that the ALJ asked a second hypothetical that included that the claimant could not tolerate even a moderate noise level. (R. 325-26). This testimony is a bit difficult to follow because the ALJ also included a question requiring that the jobs allow the claimant to work "away from other people." (R. 326). However, even within this exchange, it is possible to discern that the VE found that the sorting job, with a reduction of 50% in numbers, met both the requirement of working away from people and a moderate noise environment. (R. 326-27). Therefore, Wilson's argument is not persuasive because the ALJ's RFC determination was that Wilson needed to avoid a loud noise environment, not a moderate noise environment, but even with that more restrictive limitation, the VE's testimony was that there were still jobs Wilson could perform.

The Court rejects Wilson's last argument, which relies on details within the DOT description of the jobs, stated as "General Learning Ability," "Verbal Aptitude," "Numerical Aptitude," and "Spacial Aptitude." *See, e.g.*, Sorter, DOT #753.587-010, 1991 WL 680340. Wilson states that for the jobs identified by the VE, the four attributes listed above state that they are "Level 4 - Lowest 1/3 Excluding Bottom 10%." Because Wilson tested below the 10th percentile in many areas, he argues that he is excluded from these jobs because level 4 for these attributes excludes the bottom 10%. The Court agrees with the Commissioner that this is a novel argument that has apparently never been presented to the Tenth Circuit. One district court within the Tenth Circuit has ruled in favor of a claimant partly based on a similar argument. *See Frazee v. Barnhart*, 259 F. Supp. 2d 1182, 1198-1199 (D. Kan. 2003) (ALJ failed to inquire of VE about

conflict between borderline intellectual functioning and General Learning Ability level in DOT descriptions); *see also Sizemore v. Astrue*, 2010 WL 3001711 (E.D. Ky) (borderline intellectual functioning was not accurately portrayed in hypothetical to VE and therefore jobs requiring General Learning Ability in second third of population could not be relied upon).

The Court agrees with decisions of three other district courts rejecting this argument. *See Strickland v. Astrue*, 2011 WL 4048985 (M.D. Fla.) (rejecting arguments based on General Learning Ability, People Worker, and Data Worker aspects of DOT descriptions); *McNemer v. Astrue*, 2011 WL 5554051 (N.D. Ohio) (declining to accept argument correlating IQ score directly to General Learning Ability level); *Vasquez v. Astrue*, 2009 WL 3672519 at *3 (C.D. Cal.) (rejecting argument of claimant with borderline intellectual functioning that he could not perform job with General Learning Ability level of 4); *Gibson v. Astrue*, 2008 WL 5101822 at *5-6 (C.D. Cal.) (same). The *Gibson* court explained that the Generalized Learning Ability scale measured the ability of people to learn as a percentile of the working population. *Id.* The *Gibson* court stated that the claimant had offered no authority to support an argument that the Generalized Learning Ability scale directly correlated to an IQ or other test score. *Id.* The consulting examiners in *Gibson* had found that the claimant could understand, remember, and carry out short, simple instructions, and the ALJ had included those limitations in the RFC determination. *Id.* The VE's testimony that such an individual could perform jobs with a Generalized Learning Ability level of 4 was not inconsistent with the DOT, and it therefore was substantial evidence in support of the ALJ's Step Five finding. *Id.* The undersigned agrees with the reasoning of *Gibson* that it is not accurate to correlate borderline intellectual functioning with those aspects of the DOT that Wilson sets forth in the briefing. Wilson's borderline intellectual functioning did not lead to a conflict between the VE's testimony and the DOT, and the VE's

testimony is substantial evidence that supports the ALJ's Step Five decision.

The Court finds all of Wilson's Step Five arguments to be unpersuasive. The Court finds that the ALJ's Step Five finding is supported by substantial evidence and is in accord with the legal requirements, and therefore it is affirmed.

Opinion Evidence

Wilson argues that the ALJ erred in assigning great weight to the opinion of Dr. Smallwood while giving only significant weight to the opinions and findings of Dr. Atwood. Wilson states that Dr. Smallwood's report had internal inconsistencies and was also contradicted by Dr. Atwood's report.

Dr. Smallwood found no significant limitation in Wilson's ability to maintain attention and concentration for extended periods. (R. 282). Wilson argues that this is internally inconsistent with his Paragraph B Criteria finding that Wilson had a moderate limitation in maintaining concentration, persistence, or pace. A one-for-one correlation of those two items would be absurd, given the different structure and purpose of the two forms. The Paragraph B Criteria are only 4 broad categories, while the Mental Residual Functional Capacity Assessment includes 20 different specific functions that are listed under headings of "understanding and memory," "sustained concentration and persistence," "social interaction," and "adaptation." For the Paragraph B Criteria, Dr. Smallwood found that Wilson had a moderate restriction in his concentration, persistence, or pace, but that does not mean that he was required to find an impairment in all eight of the specific functions listed under the heading of "sustained concentration and persistence" on the Mental Residual Functional Capacity Assessment form. It was Dr. Smallwood's job to find which specific functions were implicated by Wilson's concentration issues, and he made that finding: that Wilson was markedly limited in his ability

to understand, remember, and carry out detailed instructions. (R. 282-83). That Dr. Smallwood's opinion did not include the other specific function identified by Wilson is not a conflict in his opinion evidence. *Norris v. Barnhart*, 197 Fed. Appx. 771, 775 (10th Cir. 2007) (unpublished) (separate measures on Mental Residual Funcational Capacity Assessment form did not conflict with examining consultant's opinion evidence). Wilson's argument on this point has no merit.

Wilson also notes that Dr. Smallwood made a note that Wilson "is able to perform one and two step tasks but cannot do more complex ones because of poor concentration and [low performance IQ.] (R. 284). Wilson argues that this, too, is inconsistent with his failure to find Wilson significantly limited in his ability to maintain attention and concentration for extended periods. *Id.* Again, a finding by a professional of poor concentration that limits an individual to one- or two-step tasks does not necessarily demand that the professional also make a finding of significant limitations in the individual's ability to maintain attention or concentration for extended periods. It was Dr. Smallwood's job to determine what aspects of Wilson's functionality were implicated by his impairments, and Dr. Smallwood made that analysis.

The same is true of Wilson's argument that Dr. Smallwood's findings conflicted with Dr. Atwood's statement that some of Wilson's test scores indicated an attention deficit condition, if visual impairment could be ruled out. (R. 194). An attention deficit condition could implicate several of the 20 functions listed on the Mental Residual Functional Capacity Assessment form, and would not necessarily conflict with a finding of no significant limitation on the ability to maintain attention and concentration for extended periods.

The remainder of Wilson's argument is not specific. Wilson goes into some detail regarding the results of Dr. Atwood's testing, and he then complains again that the ALJ gave

15

"great weight" to Dr. Smallwood's opinions while giving only "significant weight" to Dr. Atwood's report. Plaintiff's Opening Brief, Dkt. #15, p. 7. Wilson is of course correct that generally more weight is given to the opinions of an examining physician than to the opinions of a nonexamining physician. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). In this final section of his brief, however, Wilson does not specify in what way he argues the ALJ rejected Dr. Atwood's findings in favor of those of Dr. Smallwood. Instead, the undersigned finds that Dr. Smallwood considered all of the results of the testing and the findings Dr. Atwood made in his report, and he incorporated those into his findings on the Psychiatric Review Technique form and Mental Residual Functional Capacity Assessment form. The two reports were consistent with each other, and the ALJ relied on them both in formulating her RFC determination.

There was no error in the ALJ's consideration and weighing of the opinion evidence of Dr. Smallwood and Dr. Atwood, and the reports of both professionals constitute substantial evidence that supports the ALJ's RFC determination and her decision.

## Conclusion

The decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied. The decision is **AFFIRMED**.

Dated this 30th day of November, 2011.

_____
Paul J. Cleary
United States Magistrate Judge